UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARY HYNES,

                Plaintiff,

vs.                                      Case No. 2:04-cv-589-FtM-33SPC

AMERICAN GENERAL LIFE INSURANCE
COMPANY,

                Defendant.
_____/

**ORDER**

This matter comes before the Court on Defendant American General Life Insurance's Motion for Summary Judgment (Doc. # 20), filed on September 9, 2005. Plaintiff Mary Hynes filed a Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. # 25) on September 23, 2005. Defendant filed a Reply Memorandum (Doc. #31) on October 20, 2005. For the reasons stated herein, the motion is GRANTED.

**I.**   **STANDARD OF REVIEW**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also

1

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1989)("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . ."). Entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. Where there is a "complete failure of proof concerning an essential element of the nonmoving party's case," all other facts presented by that party are rendered immaterial. Id. at 323.

The movant bears the responsibility for demonstrating the basis for the summary judgment motion. Id. A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by

reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).

If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples *ex rel.* Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

**II.   BACKGROUND**

The undisputed facts are as follows. On or about March 27,

2003, Steven Loren applied for a $125,000 life insurance policy from American General Life Insurance Company. (Doc. # 2 ¶ 4; Doc. # 17, ¶ 4). Mary Hynes, the Plaintiff in this action, was listed as his wife and the designated beneficiary of the policy. (Doc. # 35, p. 4). The application contained two parts, Part A and Part B. (Id.). The first stage of the application process was a telephone interview between Robert Naaman, an insurance salesman, and Hynes and/or Loren, who provided Naaman with certain personal information. (Id.). Naaman transcribed the information onto Part A of the application and forwarded Part A onto Portamedic, an independent company that conducts paramedic exams for life insurance applications. (Id.). On March 27, 2003, Portamedic completed a paramedic exam of Loren and forwarded the application documents to American General for underwriting. (Id.)

In Part B of the application Loren was asked a series of questions regarding his medical history. (Id.). When his answer to the question was "yes," he was instructed to "provide details, such as: proposed insured's name, date of first diagnosis, name and address of doctor, tests performed, test results, medication(s) or recommended treatment" in the space below each group of questions. (Id. at 4-5.).

When asked if he had "ever been diagnosed as having, been treated for, or consulted a licensed health care provider for . . . cancer, tumors, masses, cysts or other such abnormalities," Loren

answered "no." (Id. at 5.). When asked whether he was "taking any medications, treatment or therapy recommended or prescribed by a medical professional, or under observation by a medical professional," Loren answered "no." (Id.). When asked whether, in the past ten years, he had "been hospitalized, consulted a health care provider or had any illness, injury or surgery," Loren answered "no." (Id.). When asked whether, in the past ten years, he had "been advised to have any diagnostic test, hospitalization or treatment that was not completed," Loren answered "no." (Id.). As part of the Portamedic exam, Loren provided blood and urine samples, which revealed elevated liver functions. (Id.).

Based on the information contained in the application and the results of the paramedic exam, American General approved Loren's application; however, because of his elevated liver functions the company raised his premium payment. (Id.). Ultimately, Loren decided on a policy with a $100,000 benefit and a 15-year term instead of the $125,000 policy for which he originally had applied. (Id.).

Loren died on February 3, 2004, as a result of combined toxicity of methadone and ethanol. (Id.). Shortly after his death, Hynes submitted a claim to American General for Loren's death benefit. (Id.). Since Loren's death occurred within the two-year contestable period, American General initiated a routine claim investigation and obtained Loren's medical records from

several medical providers, including Dr. Alexander Lozano, a doctor who had treated Loren. (Id.).

The medical records indicated that on March 7, 2003, just over two weeks before Loren applied for the policy, he visited Dr. Lozano, complaining of hoarseness. (Id.). Dr. Lozano examined and later biopsied a lesion in Loren's throat on March 11, 2003. (Id.). The biopsy report indicated that the lesion on Loren's larynx was cancerous. (Id.). Dr. Lozano discussed the findings and possible treatments with Loren and Hynes, who accompanied him to the appointment. (Id. at 6.). Loren ruled out the option requiring surgery and settled instead on the option requiring radiation and chemotherapy treatments. (Id.).

The radiation/chemotherapy treatments were scheduled for the next few days. On March 17 and 19, 2003, about a week before Loren applied for the policy, Hynes called Dr. Lozano's office several times, stating that Loren had failed to attend his appointments, was drinking heavily, and had resumed smoking. (Id.). On March 20, 2003, one week before Loren applied for the policy, Dr. Lozano wrote a letter to Loren, summarizing his findings and recommendations and expressing his concerns regarding, among other things, Loren's failure to attend the scheduled chemotherapy and radiation appointments, as well as his alcohol use. (Id.). Nowhere in his application did Loren disclose any of this information; indeed, nowhere in his application did he note that

6

Dr. Lozano had diagnosed him with cancer, that he had recommended radiation/chemotherapy treatment, nor that Loren had failed to keep his treatment appointments. (Id.).

In determining whether to issue a life insurance policy, American General states that it makes its decision based upon the information provided in the application. (Id.). Based on the information Loren provided in his application and the results of his paramedic exam, American General decided to issue a life insurance policy to him. (Id.). American General rescinded the policy and sent a check to Hynes, which was intended to be a refund of all premiums paid, and Hynes cashed the check. (Id.).

**III. ANALYSIS**

American General argues that summary judgment should be granted because it properly rescinded the life insurance policy due to knowing misrepresentations that Loren made in the application. (Doc. # 20, p. 1). In Florida, when an applicant knowingly misrepresents his or her health history and the misrepresentation is material to the insurer, then the policy is void ab initio and no proceeds are payable. See Fla. Stat. § 627.409 (2005).

Hynes argues that summary judgment is not appropriate because several genuine factual issues remain as to whether American General waived its right to rescind Loren's life insurance contract. (Doc. # 25, p. 1). Specifically, she argues that there

are four disputed issues of fact.  The first purported dispute of fact is whether, when determining if it should issue a life insurance policy to Loren, American General relied exclusively on the information contained in Loren's application and his elevated liver functions.  (Id. at 2-3.).  Hynes argues that American General may have had actual or constructive knowledge of Loren's cancer diagnosis before issuing him life insurance and/or during the time it accepted his premium payments.  (Id.).  The second purported dispute of fact is whether American General obtained Loren's medical records before issuing the life insurance policy and/or during the time it received his premium payments.  (Id. at 3.).  The third purported issue of fact is whether American General was aware that Loren had been diagnosed with cancer before it issued him life insurance and/or during the time it received his premium payments.  (Id.).  The fourth purported issue of fact is whether American General rescinded Loren's life insurance policy based on his alleged misrepresentations.  (Id.).

   The essence of Hynes's argument is not that Loren told the truth on his insurance application; rather, Hynes argues that American General has waived its right to rescind the policy because it either knew or should have known of Loren's health problems when it issued the policy.  Hynes notes that in Florida, an insurance company may not rely on the defense of the insured's misrepresentation if it had actual knowledge of the facts

8

justifying forfeiture of the policy before the policy's issuance. Johnson v. Life Ins. Co., 52 So. 2d 813, 815 (Fla. 1951). An insured's knowledge can be inferred if it deliberately disregarded "information sufficient to excite attention and call for inquiry as to the existence of facts by reason of which a forfeiture could be declared." Id.; see also id. ("The acceptance and collection of the premiums with constructive notice of the facts here relied on as a defense is certainly an 'unequivocal act which recognizes the continued existence of the policy' and which is 'wholly inconsistent with a forfeiture'. . .").

Hynes argues that three things provided American General with actual knowledge of facts justifying forfeiture before the policy's issuance. First, Loren's blood and urine samples from the Portamedic exam revealed elevated liver functions.[1] (Doc. # 25, p. 4). Second, Loren disclosed that up until 1999 he had smoked cigarettes on a daily basis. (Id.). Third, Loren noted that his

---

[1] Hynes opines that "[e]levated liver functions often signify heavy drinking," but provides no basis for this opinion. Without any support for this claim, this Court cannot accept Hynes's opinion as fact. The Court reiterates that bare allegations are insufficient because "[w]hen a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffrey, 64 F.3d at 593-94 (citing Celotex, 477 U.S. at 324). Even if Hynes had demonstrated that elevated liver functions often signify heavy drinking, Hynes did not demonstrate that heavy drinking is a fact that would have justified forfeiture. Hynes has done nothing but posit her own opinion of what certain test results "often indicate," and she has failed to carry her burden.

9

father had died of cancer. (Id.). According to Hynes, "[t]hese facts, taken as a whole, gave American General constructive notice of the risk of insuring Loren" and by ignoring these risk factors and issuing him a policy, American General waived its right to rescind the policy. (Id.).

What Hynes suggests is that knowledge of risk is equivalent to knowledge of an actual condition, not just the risk that the condition would develop. However, American General's awareness of Loren's risk factors cannot be equated with an awareness that Loren had cancer. Furthermore, risk factors would not be facts justifying forfeiture of the policy– Loren's misrepresentations about having cancer, along with his misrepresentations regarding treatment for cancer or the biopsy, and about the incomplete radiation/chemotherapy treatments were the events justifying forfeiture. Hynes provided no affidavits, deposition testimony, interrogatories, or admissions- indeed, she provided nothing at all- to indicate American General knew of facts justifying forfeiture, or that these risk factors could be considered "information sufficient to excite attention and call for inquiry as to the existence of facts by reason of which a forfeiture could be established." See Johnson, 52 So. 2d at 815.

Hynes also argues that there is a genuine issue of fact regarding American General's actual knowledge of Loren's conditions because it may have obtained his medical records either before it

10

issued the policy or during the time it accepted premium payments. Hynes bases this argument on the fact that Loren signed a medical release form and dated it March 27, 2003.  Hynes claims that because Loren dated the form on March 27, 2003, one could infer that American General sought Loren's medical records at some point before issuing him the policy or during the time it accepted his premium payments.

Short of Hynes's bare allegations that American General may have sent the records release form before it issued the policy, there is nothing in the record that indicates that American General actually did so.  Hynes is again reminded that "[w]hen a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffrey, 64 F.3d at 593-94 (citing Celotex, 477 U.S. at 324).

In truth, the only thing to which Hynes could possibly point is Dr. Lozano's deposition.  When initially questioned about the medical release form he received from American General, Dr. Lozano said that the earliest medical records request noted on his chart was Hynes's request on April 27, 2004, and a request from EMSI on May 28, 2004.  Lozano Deposition, pp. 36-37.  Dr. Lozano was questioned again about requests for Loren's medical records, and he

11

said that he had a request dated March 27, 2003, that read "American General Life Insurance Company" across the top and was signed by Flavius J. Loren, Next of Kin." Lozano Deposition, p. 41.  However, Dr. Lozano later clarified that that particular document was received as part of a five-page fax sent to his office on May 28, 2004.  Lozano Deposition, pp. 46-47.  The deposition testimony speaks for itself:

> Q: Doctor, I need to follow up on one thing, because it's not really clear and I need to really clarify it. Could you pull out those medical records requests that we were discussing earlier which are on the left side of your chart?
> A: Just go through?
> Q: Yeah, I just want to keep them in order.  Now Doctor, what I'm referring to is five pages that are stapled together.  This is that EMSI request that we were discussing before.
> A: Yes, sir.
>    . . .
> Q: Now, this is a - - you see across the top it looks like it's a "To Medical Records Liza" and a fax number.  Is this your fax number?
> A: Yes, sir, so that was faxed to us.
> Q: From whoever Tele-Pro Team is?
> A: Correct.
>    . . .
> Q: And it has a total of five pages, correct?
> A: Yes, sir.
> Q: And the date of this is May 28th, 2004, right?
> A: Right.
> Q: And in the five pages there's a cover sheet, there's a records request, and then the third page of this is the poor copy that you were talking about; correct?
> A: Yes, sir.
> Q: And then there's a separate HIPPA compliant authorization?
> A: Correct.
> Q: And there's a death certificate?
> A: Correct.
> Q: Okay, I want to refer you to the third page,

  which is this poor document here that appears to be dated March 27 of '03?
   A: Correct.
   Q: Now do you know what this document is?
   A: Well, no. I started to read it a moment ago, but it was slow going because of the poor quality.
   Q: Right. Let me ask you this, doctor.
   A: Yeah.
   Q: There's a date at the bottom, okay, but the way I read this is that the date that you received this page here was in conjunction with this full five page fax, which was received on May 28th, 2004.
   A: Okay, go back. You're saying that I received this in conjunction with this packet?
   Q: That's my understanding. I mean, tell me if you have any different understanding of that.
   A: Well, no. I mean if you go by the fax header, the original cover sheet is 5/28/2004, 3:26 p.m., page 1 of 5.
   Q: Yes.
   A: And this has the same fax header, page 3 of 5.
   Q: Exactly.
   A: So this came with this. This is dated substantially earlier, but it came as part of this packet, correct.
   Q: Right. So this document that's dated March 27th of '03 was in fact not received by your office until May 28 of 2004, is that correct?
   A: It would seem that way, yes.
   Q: Okay. Any reason to believe that it's any different than being received on that date?
   A: No, sir.

Lozano Deposition, pp. 45-47. Thus, Dr. Lozano clarified in the latter part of his deposition that his office received his office received the release on May 28, 2004 as part of a five-page fax, which also included Loren's death certificate. There is nothing to indicate that the records were requested or received by American General while Loren was still living, or at any earlier date and Hynes has failed to demonstrate a genuine issue of material fact.

  Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant American General Life Insurance's Motion for Summary Judgment (Doc. # 20) is **GRANTED**.  The Clerk of the Court is directed to enter judgment for the defendant and close the file.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida, this 27th day of January, 2006.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record